# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **JEANETTE RENÉ ABNEY,** | ) | |
| **Administratrix of the Estate of Gerald** | ) | |
| **Benjamin Abney, Jr., and** | ) | |
| **THE STATE OF NORTH CAROLINA** | ) | |
| **ex rel. JEANETTE RENÉ ABNEY,** | ) | |
| **Administratrix of the Estate of** | ) | |
| **Gerald Benjamin Abney, Jr.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **1:04CV00652** |
| | ) | |
| **DEPUTY JOEL RODNEY COE,** | ) | |
| **Individually and in his official capacity** | ) | |
| **as a Deputy of the Randolph County** | ) | |
| **Sheriff's Department,** | ) | |
| **SHERIFF LITCHARD HURLEY,** | ) | |
| **Individually and in his official capacity** | ) | |
| **as Sheriff of Randolph County;** | ) | |
| **and WESTERN SURETY COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the motions for summary judgment filed by

Defendant Joel Rodney Coe ("Deputy Coe") (Pleading No. 40) and Defendants Litchard

Hurley ("Sheriff Hurley") and Western Surety Company ("Western") (Pleading No. 37).

Plaintiff Jeanette Rene´ Abney, Administratrix, has responded in opposition to Defendants'

motions (Pleading Nos. 53, 55), and Defendants have filed replies (Pleading Nos. 69, 70).

The Court heard the oral argument of the parties on December 7, 2005 and the motions are now ready for a ruling.

## Procedural History

This action arises out of a tragic incident in which Gerald Benjamin Abney, Jr. was killed when Deputy Coe's patrol car collided with Mr. Abney's motorcycle at the end of a police pursuit in Randolph County, North Carolina. Plaintiff, the Administratrix of Mr. Abney's estate, asserts the following claims against Deputy Coe: (1) a claim under 42 U.S.C. § 1983 for excessive force used in violation of Mr. Abney's right to be free from unreasonable seizure; (2) a claim under 42 U.S.C. § 1983 for wrongful death; (3) a claim under 42 U.S.C. § 1983 for survival; (4) a state law tort claim for gross negligence; (5) a state law tort claim for assault and battery; and (6) a state law claim for wrongful death. (Pleading Nos. 1, 28.) Plaintiff asserts the following claims against Sheriff Hurley: (1) a claim under 42 U.S.C. § 1983 on grounds that Deputy Coe's constitutional violations resulted from inadequate training and supervision by Sheriff Hurley; (2) a claim under 42 U.S.C. § 1983 that the Randolph County Sheriff's Department had a policy or practice that resulted in Mr. Abney's death; and (3) a claim under 42 U.S.C. § 1983 that the Randolph County Sheriff's Department improperly trained its officers to use excessive force. *Id.* Defendant Western Surety Company is joined as the writer of an Official Bond as surety for Sheriff Hurley pursuant to N.C. Gen. Stat. § 58-76-5.

-2-

## Facts

The facts of this case are undisputed in many respects, but sharply disputed on several critical issues. On August 3, 2001, at approximately 4:45 p.m., Defendant Deputy Coe, a Randolph County deputy sheriff, was traveling northbound on Old Country Farm Road. The weather was clear and the roads were dry. (Pleading No. 41, Def. Coe's Br. in Supp. of Mot. for Summ. J., Deposition of Joel Rodney Coe ("Coe Dep.") at 83.) Deputy Coe observed a motorcyclist, later identified as Gerald Abney, traveling southbound on the same road. *Id.* at 49. Deputy Coe observed Abney cross the double yellow line in a curve as he passed several vehicles. *Id.* Deputy Coe turned his patrol vehicle around and activated his blue lights and siren in an attempt to stop the motorcyclist. *Id.* Deputy Coe temporarily lost sight of Abney and ultimately deactivated his lights and siren. *Id*. at 50.

Deputy Coe proceeded down Green Farm Road toward Old Lexington Road, where he heard the motorcycle going down a hill. *Id.* He eventually encountered Abney again near the intersection of Old Lexington Road and Caraway Mountain Road. *Id.* Abney had stopped at a stop sign, but took off again as Deputy Coe approached. *Id.* at 80. According to Deputy Coe, he could not make out the motorcycle's tag number. *Id.* at 200. Deputy Coe again activated his lights and siren in an attempt to stop Abney. *Id.* at 51. Abney made a left turn at the intersection of Caraway Mountain Road and Green Farm Road and Deputy Coe followed. *Id.*

-3-

There is disputed evidence concerning the turn onto Green Farm Road. Deputy Coe has testified upon deposition that as the vehicles made the turn, the motorcycle overshot the turn and entered the grassy shoulder of Green Farm Road; it then turned around, reentered the roadway and sideswiped the patrol vehicle on the passenger side, dislodging the rearview mirror. *Id.* Some physical evidence and the testimony of one eyewitness, Tommy Whitman, tends to corroborate this testimony. (Pleading No. 44, Affidavit of Tommy Whitman ("Whitman Aff."); Pleading No. 48, Affidavit of Line Sergeant D.A. Snodgrass ("Snodgrass Aff.").) Plaintiff, on the other hand, relies upon evidence that after Abney turned onto Green Farm Road, he slowed down and began to pull his motorcycle to the side of the road. (Pleading No. 1, Compl. ¶¶ 15, 17; Pleading No. 28, First Am. Compl. ¶¶ 15, 17.) Two eyewitnesses testified that Coe's patrol car turned onto Green Farm Road at an angle and "bumped" the back end of Abney's motorcycle while it was slowly moving, forcing the motorcycle onto the shoulder and into the grass. (Pleading No. 56, App. to Mem. in Supp. of Pl.'s Resp. to Def. Coe's Mot. for Summ. J., Tab 2, Deposition of Angela Rush ("A. Rush Dep.") at 11-15; Tab 3, Deposition of Terry Rush ("T. Rush Dep.") at 11, 13-16.) According to these witnesses, the motorcycle then righted itself after wobbling and then took off again, with Deputy Coe in pursuit. *Id.*

As Abney continued down Green Farm Road toward Old Lexington Road, Deputy Coe called the communications center to report that a motorcyclist had hit his patrol car and that he was in pursuit. (Pleading No. 56, Tab 1, Coe Dep. at 51, 70.) He stated that he was

-4-

"trying to get him stopped." (Pleading No. 48, Snodgrass Aff., Ex. A-17 at 1.) Deputy Coe followed Abney down Green Farm Road with his sirens and blue lights activated. (Pleading No. 41, Coe Dep. at 51.) Abney ran a stop sign at Green Farm Road and Old Lexington Road and made a right turn onto Old Lexington Road. *Id.* at 51-52. Deputy Jerry Rozier heard Deputy Coe's call and proceeded to the area for back-up. Deputy Rozier was traveling down Old Lexington Road when he saw the motorcyclist and Deputy Coe traveling in the opposite direction. (Pleading No. 41, Deposition of Jerry Lee Rozier, Jr. ("Rozier Dep.") at 36-37.) Deputy Rozier moved his patrol car over the center line in an attempt to stop Abney. *Id.* at 37. Deputy Rozier had his door open and was getting out of the patrol car, thinking that Abney was going to stop. *Id.* However, Abney swerved around Deputy Rozier's patrol car. *Id.*; Coe Dep. at 123. Deputy Rozier then joined the pursuit, falling behind Deputy Coe's patrol car. (Rozier Dep. at 54.)

The chase proceeded and, according to Deputies Coe and Rozier, Abney ran a stop sign at the intersection of Old Lexington Road and Highway 64. (Pleading No. 41, Coe Dep. at 51-52; Rozier Dep. at 57.) Deputy Coe's patrol car was directly behind Abney's motorcycle as they traveled west on Highway 64. (Pleading No. 56, Coe Dep. at 137.) Traffic on Highway 64 was fairly heavy, and the uncontroverted evidence shows that neither Deputy Coe nor Abney exceeded the speed limit during this part of the pursuit. (Pleading No. 41, Rozier Dep. at 60.) The pursuit continued for approximately six-tenths of a mile. At Mount Shepherd Road, Abney made a wide right turn. (Coe Dep. at 52; Rozier Dep. at

-5-

62; Pleading No. 56, Tab 8, Deposition of Kimberly Deyton ("K. Deyton Dep."); Pleading

No. 69, Def. Coe's Reply Br., Deposition of Kimberly Deyton ("K. Deyton Dep.") at 13.)

Some eyewitnesses testified that another vehicle made the turn directly ahead of Abney and

began to pull onto the shoulder. (Pleading No. 69, K. Deyton Dep. at 12, 14; Coe Dep. at 52;

Deposition of David Deyton ("D. Deyton Dep.") at 11, 13.) Other eyewitnesses did not see

this third vehicle. (Pleading No. 56, Tab 5, Deposition of Richard Hunt ("R. Hunt Dep.")

at 27; Tab 4, Rozier Dep. at 68.) Deputy Coe accelerated during the turn onto Shepherd

Farm Road. (Pleading No. 69, K. Deyton Dep. at 11, 48; Coe Dep. at 153, 155.) Within

seconds, Deputy Coe's vehicle collided with Abney's motorcycle. Mr. Abney was later

pronounced dead at the scene.

Deputy Coe testified that as he turned onto Mount Shepherd Road, his view of Abney

was temporarily obstructed by the terrain and by a third vehicle sitting on the side of Mount

Shepherd Road. (Pleading No. 69, Coe Dep. at 52.) When he saw the motorcycle again, it

was wobbling and had lost speed, and although he tried to avoid a collision by braking and

turning to the left, it was too late. (Coe Dep. at 52, 156-157, 164-165.) Other witnesses

believed that the motorcycle did not wobble prior to being hit by Deputy Coe. (Pleading

No. 56, Hunt Dep. at 24; K. Deyton Dep. at 14.) One eyewitness who was traveling on

Highway 64 testified that it appeared that Deputy Coe intended to bump the motorcycle,

although he could not say for sure. (Hunt Dep. at 8, 12.)

-6-

Defendant Litchard Hurley has been the Sheriff of Randolph County since 1989 and has final policymaking authority in the Sheriff's Department. (Pleading No. 39, Affidavit of Litchard D. Hurley ("Hurley Aff.") ¶ 3.) During his tenure, all deputy sheriffs have been required to complete the Basic Law Enforcement Training ("BLET") program mandated by the State of North Carolina within one year of being sworn in as a deputy sheriff. *Id*. ¶ 4. They also participate in a field officer training program run by the Randolph County Sheriff's Department. *Id.* ¶ 5. During the field training program, the training officer discusses the policies and procedures of the Sheriff's Department, including, but not limited to, those policies and procedures that relate to excessive force and vehicular pursuits. *Id.* In addition, all deputies must take a defensive driving course and be re-certified annually in defensive driving. *Id.* ¶ 6.

According to Sheriff Hurley, the Sheriff's Department maintains a verbal vehicular pursuit policy as follows:

> If there is a felony committed, a serious misdemeanor, or if the individual is endangering or has endangered the motoring or general public, then the deputy may make the decision to chase and/or pursue the suspect. During the pursuit, the deputy must notify communications of vehicle tag number, description of vehicle, location that officer is stopping or pursuing the vehicle. The officer will then stay in contact with communications as to location, conditions of traffic, etc. If the offense is minor, the officers have the authority to continue the chase in their discretion. The deputies are encouraged to get a tag number and identification of the suspect if possible and charge the suspect later. North Carolina state law requires that any time an officer is running emergency traffic or chasing/pursuing an individual then he or she must activate his or her blue lights and siren. Any officer can call off a chase at any time if it is not safe. A supervisor monitors the pursuit and any supervisor can call off a chase at any time. The officer should consider the following factors: speed, weather

-7-

conditions, traffic levels, the safety of the motoring public, the type of crime committed and any other factors that may become evident as the pursuit continues.

(Hurley Aff. ¶ 9; Pleading No. 54, App. to Mem. in Supp. of Pl.'s Resp. to Def. Hurley's Mot. for Summ. J., Ex. 1, Deposition of Litchard Hurley ("Hurley Dep.") at 40-41.) A number of witnesses have confirmed the existence of such a policy. (Pleading No. 38, Br. of Defs. Hurley & Western Surety Co. in Supp. of Mot. for Summ. J., Deposition of Deputy Michael T. Blakely ("Blakely Dep.") at 25, 27; Pleading No. 54, Ex. 6, Deposition of Major Allen McNeill ("McNeill Dep.") at 12, 76; Pleading No. 70, Def. Hurley's Reply Br., Attach. 4, Deposition of Michael W. Craven ("Craven Dep.") at 29-30; Attach. 5, Deposition of William B. Bunting ("Bunting Dep.") at 20-22, 29; Attach. 5, Deposition of Raymond Brady ("Brady Dep.") at 74-75.) Others have denied being aware of such a policy. (Pleading No. 54, Ex. 7, Deposition of Hugh Kevin Hines ("Hines Dep.") at 16, 37-38.)

The verbal policy expressed above does not specifically address the matter centrally in issue here – whether officers may use what is known as a pursuit intervention tactic ("PIT") during a chase. A PIT involves bumping, ramming or sideswiping a vehicle in order to end a chase. (Pleading No. 54, Ex. 2, Bunting Dep. at 28-30.) Sheriff Hurley testified that the use of such tactics to end a vehicular pursuit are strictly prohibited. (Hurley Dep. at 78, 113.) Sheriff Hurley testified that he did not know whether his deputies had been instructed on this policy, but he expected his majors and lieutenants to instruct their deputies on it. *Id.* at 82, 109. Several officers testified that it was their understanding that striking moving

-8-

vehicles to end a chase was permitted only in extreme situations, such as when a felony had been committed and the suspect was seriously endangering the lives of officers or others. (Pleading No. 54, Craven Dep. at 38; McNeill Dep. at 20.) Captain William Bunting testified that the Department did not have a policy prohibiting the use of PIT maneuvers, and further testified that he had heard of officers using such a tactic. (Bunting Dep. at 28-30.) He identified three incidents he had heard of in which a patrol vehicle struck a pursued vehicle: this case, an incident involving deceased captain Doug Sillmon, and an incident involving Mark Brady. *Id.* at 30.

Plaintiff cites the three incidents identified by Captain Bunting as evidence of three occasions when Randolph County deputies "intentionally rammed vehicles during police pursuits" and of which Sheriff Hurley had notice. (Pleading No. 53, Pl.'s Resp. to Def. Hurley's Mot. for Summ. J., at 2.) Plaintiff also points to the following incidents as additional evidence of a pattern or practice of the use of excessive force during law enforcement chases: an incident involving Robert Allred (Pleading No. 54, Ex. 3, Allred letter); another incident, on December 31, 1999, involving Deputy Coe (Ex. 4, Defendant's responses to requests for production); Sheriff Hurley's testimony concerning incidents involving Deputies Cheek and Akens (Ex. 1, Hurley Dep. at 130); and Captain Brady's testimony that approximately five of his police pursuits ended in collisions of some nature (Ex. 5, Brady Dep. at 56).

Defendant Hurley has submitted additional testimony addressing the incidents cited by Plaintiff. First, Mark Brady, a captain with the Randolph County Sheriff's Office, describes four incidents in which he was involved. (Pleading No. 70, Attach. 1, Affidavit of Mark Brady ("Brady Aff.").) The first incident occurred on July 19, 1994 and involved the vehicular pursuit of a narcotics suspect. Brady Aff. ¶ 2. During the pursuit, the suspect ran stop signs and stop lights and discarded evidence out the window of his vehicle. *Id.* The patrol car and the pursued vehicle made contact when the suspect turned right and applied his brakes and Brady was unable to avoid hitting the vehicle from behind. *Id.* No person or property was harmed and no complaint was filed. *Id.* The second incident happened on February 12, 1995 when a number of detectives from various counties and municipalities, including Brady, were conducting surveillance of a narcotics suspect. *Id.* ¶ 3. Brady denies that there was any contact between vehicles on this occasion. *Id.* The third incident occurred in 1998, during a purchase of cocaine by an undercover officer. *Id.* ¶ 4. According to Brady, while other units were pursuing the suspect, the suspect's vehicle spun out of control and hit a barricade. *Id.* There was no contact between vehicles. *Id.* Finally, in 2001, officers of the Asheboro Police Department were in pursuit of a stolen vehicle. *Id.* ¶ 5. Brady and another officer joined the pursuit. *Id.* At some point, Brady lost sight of the suspect. Subsequently, the suspect's vehicle hit a telephone pole and the suspect fled on foot. *Id.* Brady did not actually observe the collision. *Id.* There was no contact between a patrol vehicle and the suspect's vehicle. *Id.*

-10-

Deputy Coe also offers testimony expanding on the circumstances underlying the December 31, 1999 incident cited by Plaintiff. (Pleading No. 70, Attach. 2, Affidavit of Joel Rodney Coe ("Coe Aff.").) According to Deputy Coe, he was a passenger in a vehicle driven by Deputy Warren Westmoreland and they were responding to a fight in progress call. *Id.* ¶ 2. When they arrived at the scene, one of the suspects fled in a vehicle and Deputy Westmoreland followed. *Id.* ¶ 3. While going around a curve, Deputy Westmoreland lost control of the patrol vehicle and the patrol vehicle went down an embankment and struck a tree. *Id.* ¶ 4. The pursued vehicle was not involved in the collision. *Id.* ¶ 5.

By affidavit, Sheriff Hurley offers additional evidence concerning the Sillmon incident mentioned by Captain Bunting. (Pleading No. 70, Attach. 3, Affidavit of Sheriff Hurley ("Hurley Aff. # 2").) According to Sheriff Hurley, in or around 1990, now deceased Captain Sillmon blocked an exit to a parking lot to prevent a drug trafficking suspect from escaping. *Id.* ¶ 2. The suspect tried to leave the scene by hitting Captain Sillmon's vehicle. *Id.* With regard to the Allred incident, Sheriff Hurley notes that no complaint was ever filed regarding the matter. *Id.* ¶ 3. The Allred letter itself suggests that a warrant had been issued for a felony committed by the suspect and, in any event, the letter is not competent evidence for consideration during summary judgment review. *See* Fed. R. Civ. P. 56(e). (Pleading No. 54, Ex. 3.)

Other than in connection with this case, no complaint has ever been filed against the Randolph County Sheriff's Department for use of pursuit intervention tactics or excessive

use of force during law enforcement pursuits.  (Pleading No. 39, Hurley Aff. ¶ 11.)  Sheriff Hurley admits to having disciplined at least two deputies in the past for misconduct in a vehicular chase.  (Pleading No. 54, Hurley Dep. at 130.)

## Discussion

## I. Plaintiff's § 1983 Claims Against Deputy Coe

Plaintiff asserts federal claims against Deputy Coe under 42 U.S.C. § 1983.  Section 1983 represents a statutory mechanism for recovering damages for the violation of constitutional and other federal rights by certain persons.  *See Monroe v. Pape*, 365 U.S. 167 (1961); *Maine v. Thiboutot*, 448 U.S. 1 (1980).  Section 1983 is not itself a source of rights, but merely provides "a method for vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

The first task in any § 1983 suit is to identify the precise constitutional right allegedly infringed.  *Id.* at 140.  Plaintiff's Counts I through VI all rest upon a single primary legal claim – that Deputy Coe violated Gerald Abney's Fourth Amendment right to be free from unreasonable seizure.  To establish a Fourth Amendment claim, Plaintiff must first show that

Mr. Abney was subjected to a "seizure" within the meaning of the Fourth Amendment.[1] A Fourth Amendment seizure occurs when "there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). In *Brower*, the Court considered the parameters of a seizure in the context of a high speed chase that ended when the fleeing suspect fatally crashed into a "deadman roadblock" set up by county law enforcement officers. *Id*. at 593. Brower alleged that the officers placed an 18-wheel truck completely across the highway in the path of the fleeing vehicle, behind a curve, and with a police cruiser's headlights aimed in such a fashion as to blind the driver as he approached. The Court concluded that the roadblock in *Brower* constituted a seizure under the Fourth Amendment because it "[was] not just a significant show of authority designed to induce a voluntary stop, but [was] designed to produce a stop by physical impact if voluntary compliance [did] not occur." *Id.* at 598. The Court explained that

> [A] Fourth Amendment seizure does not occur whenever there is a
> governmentally caused termination of an individual's freedom of movement
> (the innocent passerby), nor even whenever there is a governmentally caused

---

[1] Deputy Coe argues in his principal brief that Plaintiff's federal claim should be analyzed under the Fourteenth Amendment. However, "[a]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment." *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1997) (*citing Graham v. Connor*, 490 U.S. 386, 394-395 (1989)). Plaintiff alleges that Coe terminated Abney's freedom of movement through means intentionally applied, bringing his claim squarely within the parameters of the Fourth Amendment. Plaintiff makes no alternative allegation of a Fourteenth Amendment violation.

and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Id.* at 596-97.[2]  To illustrate the distinction, the Court provided two hypotheticals.  The first

hypothetical involved an accidental collision, with the Court noting that no seizure occurs

if a fleeing suspect unexpectedly loses control of his vehicle and crashes.  *Id.* at 595-96.  The

second hypothetical illustrated that a seizure would occur where, for example, a police

cruiser "pulled alongside the fleeing car and sideswiped it, producing the crash."  *Id.* at 597.

Plaintiff contends that there was a Fourth Amendment seizure in this case because the

evidence supports an inference that Deputy Coe intentionally struck the rear of Abney's

motorcycle on Mount Shepherd Road in an attempt to end the chase, resulting in the fatal

collision.  For this proposition, Plaintiff relies primarily on (1) eyewitness testimony that

earlier in the chase, while turning onto Green Farm Road, Deputy Coe bumped the rear tire

of Abney's motorcycle to force it off the road; (2) eyewitness testimony that it appeared that

Deputy Coe intentionally bumped the motorcycle on Mount Shepherd Road, causing the fatal

collision;  and (3) the absence of skid marks on Mount Shepherd Road.  On the first point,

Plaintiff proffers evidence of Deputy Coe's earlier use of a PIT maneuver on Green Farm

Road.  Two eyewitnesses testified that immediately after Deputy Coe turned onto Green

---

[2]  This means simply that there must be sufficient evidence for the jury to find an intent to end freedom of movement by some act of physical restraint.  It does not require a showing of criminal intent or intent to harm.  *See Vatheken,* 154 F.3d at 178 (by giving command "find him," police intended for police dog to find and seize anyone in the house).

-14-

Farm Road behind Abney, the front end of the deputy's patrol car bumped the rear tire of the motorcycle while the vehicles were still moving, causing the motorcycle to veer into the ditch. (Pleading No. 56, T. Rush Dep., A. Rush Dep.) Second, Plaintiff points to the testimony of another eyewitness, Richard Hunt, to show that Deputy Coe repeated or attempted to repeat this maneuver after turning behind Abney onto Mount Shepherd Road, and intentionally struck the rear of the motorcycle.[3] (Pleading No. 56, Hunt Dep. at 8, 12-13.) Third, Plaintiff contends that the lack of skid marks from the patrol car on Mount Shepherd Road indicates that Deputy Coe intended to make contact with Abney's motorcycle.

Deputy Coe, on the other hand, maintains that the fatal collision between his patrol car and the motorcycle was purely accidental. Deputy Coe testified that while turning onto Mount Shepherd Road, he temporarily lost sight of the motorcycle due to a third vehicle that had turned ahead of the motorcycle. (Pleading No. 41, Coe Dep. at 52.) Deputy Coe further testified that the next moment he saw the motorcycle it was wobbling as if the driver had lost control. *Id.* According to Deputy Coe, he slammed on his brakes in an attempt to stop, but it was too late and he hit the motorcycle. *Id.* Plaintiff offers evidence to attempt to discredit Coe's description of the collision, including testimony by eyewitnesses that there was no

---

[3] Hunt's testimony about Deputy Coe's apparent intentions was equivocal. He stated that he believed that Deputy Coe intended to bump the motorcycle, but in response to the question, "So without knowing what he [Coe] was thinking, it appeared to you that he intended to hit the motorcycle?" Hunt said, "I can't say that. No, I can't – I'm sorry." (Pleading No. 56, Hunt. Dep. at 12.)

third vehicle or they did not recall seeing a third vehicle (Pleading No. 56, Hunt Dep. at 10; Rozier Dep. at 68), and testimony by two eyewitnesses that the motorcycle was not wobbling or skidding immediately before the impact. (Hunt Dep. at 24; K. Deyton Dep. at 14.) Finally, Plaintiff emphasizes the absence of skid marks to dispute Deputy Coe's contention that he slammed on his brakes.

After careful review, the Court finds Plaintiff's evidence sufficient to create a material dispute of fact regarding whether Deputy Coe intentionally struck Abney's motorcycle on Mount Shepherd Road, thereby causing the fatal collision. The evidence, although controverted, of an earlier intentional bumping by Deputy Coe when the vehicles were cornering on Green Farm Road is sufficient to raise a reasonable inference of intentional conduct by Deputy Coe during the second contact between the vehicles. If Deputy Coe intentionally struck Abney's motorcycle, this striking would represent a "seizure" under the Fourth Amendment – a termination of freedom of movement by means intentionally applied.

Since there is sufficient evidence to reach the jury on the issue of seizure, the Court must consider whether such a seizure was reasonable. "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen [are] analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of a seizure must be determined from the totality of the circumstances, balancing the nature and quality of the intrusion against the countervailing governmental

-16-

interests at stake. *Id.* at 396-97. The question in each case is whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting the officer. *Id.*

In cases in which a seizure involves the use of deadly force to stop a fleeing suspect, such a seizure will generally be found reasonable only if the officer had reason to believe that the suspect posed a threat of serious physical harm to the officer or others, or had committed a serious violent crime and was attempting to escape. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). This Court finds it difficult to imagine circumstances in which a patrol car's use of a pursuit intervention tactic such as striking a moving motorcycle from behind would *not* constitute the use of deadly force. The Court finds no cases addressing the use of such a maneuver on a motorcycle as opposed to a car or truck, but the maneuver has been viewed as deadly force even when used against a car. *See Harris v. Coweta County, Georgia,* 406 F.3d 1307, 1314-16 (11th Cir. 2005); *Helseth v. Burch*, 258 F.3d 867, 877-78 (8th Cir. 2001), *cert. denied*, 534 U.S. 1145 (2002). Common sense dictates that, even at the relatively low speeds involved in this case, contact between the front bumper of a moving car and the rear tire of a motorcycle is almost certain to result in loss of control of the motorcycle and create a substantial risk of serious injury or death to the motorcycle rider.

In the context of this case, Abney, who was riding a motorcycle, cannot be seen as a serious threat to Deputy Coe, who was driving a patrol vehicle. There is no evidence that Abney had committed a felony or had a weapon on his person. Although Abney's erratic and

-17-

irresponsible driving before the pursuit began certainly justified initiation of the pursuit, and his flight justified its continuation, there are no facts on the record before the Court that could justify the use of a pursuit intervention tactic in order to end the chase. The uncontroverted testimony shows that immediately before the turn onto Mount Shepherd Road, neither Abney nor Coe were speeding. Although Abney had swerved around Deputy Rozier's vehicle in an attempt to evade capture, a reasonable jury could conclude that having previously been struck by Deputy Coe, Abney was in fear for his own safety, and not merely bent on escape. The Court concludes that striking the rear of Abney's motorcycle in an attempt to end the chase under the facts presented here, if believed by a jury, would represent an unreasonable seizure.

Having determined that a jury could reasonably find a violation of Mr. Abney's constitutional rights by Deputy Coe, the Court must address Deputy Coe's defense of qualified immunity. Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The relevant inquiry in this case is whether the law, as it existed on August 3, 2001, was sufficiently clear to give reasonable law enforcement officers "fair notice" that intentionally striking a motorcycle with a patrol car under the circumstances at hand was unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

-18-

In considering a claim of qualified immunity, the first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct. Here, that right is the Fourth Amendment right to be free from excessive force in the course of a seizure. The Court then must determine whether the facts, viewed in the light most favorable to the plaintiff, can make out a violation of that right. This Court has found that, although there are sharp and material disputes of fact in this case, the facts viewed most favorably to Plaintiff would demonstrate a Fourth Amendment violation. Finally, the Court considers whether, at the time of the claimed violation, the specific right was clearly established – meaning that a reasonable official would understand that what he was doing violates the right in question. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The exact conduct at issue need not have been held unlawful in order to find that a law enforcement officer violated a clearly established constitutional right. *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005). Even when the very action at issue has not previously been held unlawful, general statements of the law may nevertheless make it manifest that constitutional rights are being violated. *Id.* The Fourth Amendment right to be free from unreasonable seizures encompasses seizures accomplished by excessive force. The test for whether force is excessive was clearly stated in *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Under *Garner*, deadly force is excessive and unconstitutional unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others or has committed a serious violent crime. *Id.* at 11.

-19-

Deputy Coe contends that he was faced with a suspect who was endangering the lives of others by passing cars over double yellow lines in curves, and running stop signs. (Pleading No. 69, Def. Coe's Reply Br. at 10.) Coe maintains, through counsel, that under these circumstances, a reasonable officer could have believed it to be lawful conduct to bump the motorcycle during low speeds while cornering on a lightly traveled rural road in order to put an end to the pursuit. *Id.* The Court disagrees. Whether or not a reasonable officer would view Abney's conduct as endangering the lives of others must be viewed at the time of the challenged conduct. *Waterman*, 393 F.3d at 477. Although there is evidence that Abney had committed traffic offenses by crossing a double yellow line and running stop signs during the chase, this is not enough to justify the use of deadly force. The evidence, viewed most favorably to Plaintiff, simply does not suggest that Abney posed such a threat to the safety of others that deadly force against him was justified in order to put an end to the chase. As discussed previously, there is an evidentiary dispute over critical facts, including whether Deputy Coe, while accelerating, intentionally struck the rear tire of Abney's motorcycle in an attempt to end the chase. If Deputy Coe intentionally used such force against a suspect riding a motorcycle, whose only known offenses were unsafe driving and fleeing a sheriff's deputy, he engaged in conduct that clearly was not permitted under constitutional law that was well established in August, 2001. Accordingly, Deputy Coe has not shown a right to qualified immunity in this case when facts are viewed most favorably to Plaintiff.

-20-

## II.     Plaintiff's § 1983 Claims Against Sheriff Litchard Hurley

Plaintiff asserts claims against Sheriff Litchard Hurley individually and in his official capacity under 42 U.S.C. § 1983 on grounds that the constitutional violation committed by Deputy Coe is legally attributable to the Sheriff and the Randolph County Sheriff's Department. Specifically, Plaintiff maintains that Sheriff Hurley countenanced a practice or custom of ramming fleeing motorists, that he failed to train his officers on how to terminate motor vehicle pursuits, and that he failed to establish a vehicular pursuit policy.

The claims against Sheriff Hurley in his official capacity are, in essence, claims against the Randolph County Sheriff's Department. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Municipalities and other local government entities are "persons" who can be held liable for constitutional violations under § 1983. *See Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 662 (1978). However, when an employee of a governmental entity has violated an individual's constitutional rights, the governmental entity may not be held liable based solely on the concept of *respondeat superior*. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120-21 (1992). For governmental liability to attach, a departmental "policy" or "custom" must be found to have been the moving force behind the constitutional violation or there must be evidence of a deliberate indifference to an obvious need for more training relevant to the violation. *Id.* Here, Plaintiff attempts to establish the existence of a policy by showing that the Sheriff tacitly condoned the frequent unlawful bumping and ramming of pursued vehicles; further, he attempts to show that the

Sheriff was indifferent to a need to train his deputies regarding the use of such tactics. (Pleading No. 53, Pl.'s Resp. to Def. Hurley's Mot. for Summ. J.)  Plaintiff's first argument is that Sheriff Hurley tacitly adopted a policy of bumping or ramming fleeing vehicles because he had constructive notice of the widespread use of such practices and did nothing in response. *Id.* at 9-12.  Under this argument, Plaintiff must show a "custom or usage" in the sense of "persistent and widespread practices" by employees.  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1986).  Such practices may be attributed to a governmental entity only when the duration and frequency of the practices warrants a finding that the entity knew or should have known of the extent of the practices.  *Id.*  Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities to be informed, official duty to be informed, or a combination of these factors. *Id.* at 1391.  A sufficiently close causal link between the custom or usage and the specific violation alleged must also be shown.  *Id.*  To establish such a link, the evidence must show not merely that the violation was likely to happen, but that it was "almost bound to happen, sooner or later." *Id.*   A single violation is not enough to establish this basis for governmental liability.  *Id.*

Plaintiff argues that there is evidence of "approximately one dozen *collisions*" associated with vehicular pursuits by Randolph County deputies.  (Pleading No. 53 at 18) (emphasis added.)   To the Court's mind, however, only one other occurrence cited by Plaintiff – the July 19, 1994 incident involving Mark Brady – bears any significant

-22-

resemblance to the facts of this case. A number of the incidents are insufficiently described by the Plaintiff's proffered evidence for the Court to make any comparison. In view of the uncontroverted evidence submitted by Defendant, however, none of the other incidents appears to involve the use of a pursuit intervention tactic upon a motorcycle or even upon a car or truck.[4] (Pleading No. 70, Def. Hurley's Reply Br., and attachments.) Viewed as a whole and most favorably to Plaintiff, Plaintiff's evidence remains insufficient to support an inference that a custom of or use of excessive force by intentionally colliding with pursued vehicles or using pursuit intervention tactics had developed or that such practices were so widespread that the Sheriff was on notice of them.

Plaintiff also contends that Randolph County deputies were inadequately trained in how to terminate vehicular pursuits and that this inadequacy resulted in the asserted violation of Abney's constitutional rights. Although the "inadequate training" theory differs in some respects from the condonation theory, the evidentiary requirements remain exacting. Inadequate training may serve as the basis for § 1983 liability against a governmental entity only where the failure to train amounts to deliberate indifference to the constitutional rights of persons with whom law enforcement officers come into contact. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). The Court must first determine whether the training is adequate.

---

[4] One incident *could* be considered to represent the use of a pursuit intervention tactic by an officer – the "Sillmon incident." For reasons described *infra* at page 26 of this opinion, however, the police action in the Sillmon incident was objectively reasonable and not unconstitutional. Therefore, it is not evidence of either a custom that condoned unlawful conduct or of a need for further training.

-23-

*Id.* at 390.  If the training is not adequate, the Court must determine whether the failure to train reflects deliberate indifference to the constitutional rights of its inhabitants.  *Id.*  Finally, there must be a close causal connection between the inadequate training and the alleged constitutional deprivation.  *Id.* at 392.

The evidence shows that in addition to basic law enforcement training, Randolph County deputies complete a field officer training program and annual in-service defensive driving courses.  (Pleading No. 39, Hurley Aff. ¶¶ 4-5.)  In addition, a supervisor monitors all vehicular pursuits.  *Id.* ¶ 9.  According to Sheriff Hurley, deputies are not allowed to ram or bump fleeing vehicles in order to end a pursuit.  (Pleading No. 54, Hurley Dep. at 78, 113.)  Sheriff Hurley testified that he expected his majors and lieutenants to advise their deputies of this policy. *Id.*  Sheriff Hurley could not specifically identify any formal training materials or classes in which the policy is covered, but deferred to Major McNeill on the issue.  (Hurley Dep. at 78; McNeill Dep. at 19.)  Major McNeill testified that there are no classes or training materials that address vehicular pursuits or how to end a chase when a suspect refuses to stop.  (McNeill Dep. at 14, 19.)  Nevertheless, the officers' testimonies show, without exception, a collective understanding that bumping was not allowed except in very serious, e.g. life-threatening, circumstances.

Only if, "in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy *so likely* to result in the violation of constitutional rights," can the governmental entity "be said to have been deliberately

-24-

indifferent to that need." *City of Canton*, 489 U.S. at 390 (emphasis added). In order to establish "deliberate indifference," a plaintiff must demonstrate a supervisor's "continued inaction in the face of documented widespread abuses." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). Proof of a single incident of unconstitutional activity is insufficient to show a policy or custom of deficient training or a causal link between such failure and the relevant incident. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Carter v. Morris*, 164 F.3d 215, 220 (4th Cir. 1999). A plaintiff is required to show a pattern sufficient to place the department on notice that it needed to take action to prevent constitutional deprivations of the specific type alleged in the Complaint. *Spell*, 824 F.2d at 1391-94.

Plaintiff lacks evidence sufficient to permit an inference that the use of aggressive pursuit intervention tactics like "ramming" vehicles was so widespread in Randolph County that the Sheriff knew or should have known of such conduct. At most, only one of the incidents that occurred prior to the alleged incident even remotely resembles the circumstances of this case -- the July 19, 1994 incident involving Mark Brady. The undisputed evidence before the Court is that Captain Brady was pursuing a suspect who was throwing evidence out of his window and violating numerous traffic laws. The suspect made a right turn and braked suddenly, causing Brady to lightly impact the back of the suspect's car. The contact caused no personal property damage and resulted in no complaint. Significantly, there is no evidence that Brady intentionally caused the contact between his

-25-

patrol car and the vehicle he was following, which braked rapidly. (Pleading No. 70, Brady Aff. ¶ 2.)

In the "Sillmon incident" of 1990, Captain Sillmon of the narcotics division used his patrol car to block an exit to a parking lot so that a drug suspect could not leave. The suspect tried to exit the lot by hitting the patrol car. The suspect was apprehended and never made a complaint regarding the incident. In evaluating this evidence, it is clear that even if Captain Sillmon's tactic could be viewed as a "seizure" under the Fourth Amendment, the tactic was objectively reasonable and not unlawful. As such, it could not constitute evidence of a prior unlawful use of force that could put Sheriff Hurley on notice of a need for additional training.

In sum, there is no evidence from which a jury could reasonably find deliberate indifference on the part of the Randolph County Sheriff in training his deputies on the use of pursuit intervention tactics or intentional collisions in vehicular pursuits. In briefing, Plaintiff attempts to define the alleged deficiency more broadly (as "excessive use of force during vehicular pursuits") in order to capture additional "prior" incidents. This is not the proper analysis.[5] Plaintiff must show that there was a *specific* deficiency causally linked to the *specific* injury in this case, and that the *specific* misconduct allegedly had occurred so often that it was obvious that additional training was needed. *Spell*, 824 F.2d at 1390. This

---

[5] To the extent that Plaintiff contends that the Sheriff's Department improperly trained its deputies to use excessive force, there is no evidence to support that finding. The collective understanding expressed by the officers and deputies was that deadly force was not permissible except in very narrow circumstances such as pursuit of a dangerous felon or where the life of officers or other citizens was in danger.

Plaintiff cannot do here. The evidence does not support an inference that the use of pursuit intervention tactics or intentional collisions was so widespread that deadly collisions were a reasonable probability as opposed to a mere possibility.

For these reasons, Sheriff Hurley is entitled to summary judgment on all federal claims brought against him both in his individual and official capacities. For the same reasons, Deputy Coe is entitled to summary judgment on all federal claims in his official capacity.

## III.    State Law Claims

Plaintiff also asserts state law claims against Deputy Coe for assault and battery, gross negligence and wrongful death.[6]  Plaintiff asserts that Western, Sheriff Hurley's surety, may be held liable based on the tortious conduct of Deputy Coe.  The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a)  (West 1993 & Supp. 2005).

Plaintiff asserts state law claims against Deputy Coe in both his individual and official capacities.  With respect to liability of an officer in his individual capacity, North Carolina law recognizes public officer immunity.  Under the public officer's immunity doctrine, "a

_____

[6]   Plaintiff's claim for wrongful death under N.C. Gen. Stat. § 28A-18-2 invokes the North Carolina statutory definition of the measure of damages recoverable by reason of "wrongful act resulting in death," and vests the cause of action in the personal representative of the decedent (Jeanette Rene′ Abney, Administratrix, in this case). Apart from the measure of damages, recovery for wrongful death depends upon the same proof of actionable misconduct which would ordinarily apply in an action strictly for personal injury. *See Nelson v. United States*, 541 F. Supp. 816 (M.D.N.C. 1982).  Therefore, Plaintiff's wrongful death claims will survive for trial only if Plaintiff's gross negligence or assault and battery claim survives.

public official is [generally] immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties." *Slade v. Vernon*, 110 N.C. App. 422, 428, 429 S.E.2d 744, 747 (1993). A finding of malice defeating public officers' immunity under North Carolina law requires a finding that a reasonable officer would know that the actions in question were contrary to the officer's duty. *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984) ("A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.") The public officer's immunity analysis under state law is quite similar to the qualified immunity analysis under federal law in Section 1983 actions. *See Lea v. Kirby*, 171 F. Supp. 2d 579, 584 (M.D.N.C. 2001).

Plaintiff also asserts claims against Deputy Coe in his official capacity. Claims against public officials typically are barred by the doctrine of governmental immunity when officials are performing a governmental function. *See Messick v. Catawba County*, 110 N.C. App. 707, 431 S.E.2d 489, *disc. rev. denied*, 334 N.C. 621, 435 S.E.2d 336 (1993). However, North Carolina recognizes an exception to this immunity when the surety (Western, in this case) is added as a party, allowing the plaintiff to seek relief for the neglect, misconduct or misbehavior of officials in the performance of their official duties. N.C. Gen. Stat. § 58-76-5 (West 2003). The statute merely lifts the protective veil of immunity; it does

-28-

not provide the applicable standard for liability.  *See Stafford v. Barker*, 129 N.C. App. 576, 585, 502 S.E.2d 1, 6 (1998).  The plaintiff still bears the burden of proving tortious conduct that resulted in injury or, in this case, death.   *Id.*

Plaintiff alleges that Deputy Coe committed a state law assault and battery (Count VIII) and was grossly negligent in the performance of his official duties (Count VII).   The Court finds that Plaintiff's claim for assault and battery fails as a matter of law.  At the time of the incident giving rise to this lawsuit, a one-year statute of limitations applied to intentional tort claims.  *See* N.C. Gen. Stat. § 1-54(3).[7]  The statute of limitations had run well before the filing of this action in July 2004.  The assault and battery claim (Count VIII) is therefore time-barred.

Plaintiff also contends that Deputy Coe's conduct was grossly negligent under state law (Count VII).  Whereas simple negligence is the failure to act as a reasonably prudent person under like circumstances, the standard for gross negligence requires a heightened level of misconduct.  The difference between ordinary negligence and gross negligence is substantial.  "Negligence, a failure to use due care, *be it slight or extreme,* connotes inadvertence . . . ."  *Hinson v. Dawson*, 244 N.C. 23, 28, 92 S.E.2d 393, 396 (1956).  Gross negligence requires "wanton conduct done with conscious or reckless disregard for the rights and safety of others."  *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988).

---

[7]  Pursuant to S.L. 2001-175, Sect. 3, the General Assembly made clear that the extension of the statute of limitations for assault and battery to three years applied only to claims arising on or after October 1, 2001.

"An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929). To recover on a claim for gross negligence, a plaintiff must also show that the harm was proximately caused by the grossly negligent conduct. *See Clayton v. Branson*, 613 S.E.2d 259, 693 (2005).

Courts have discussed several factors relevant to the issue of whether conduct of a law enforcement officer engaged in pursuit of a fleeing suspect constitutes gross negligence as opposed to simple negligence. *Norris v. Zambito*, 135 N.C. App. 288, 294, 520 S.E.2d 113, 117 (1999). Those factors include: (1) the reason for the pursuit; (2) whether the suspect was known to the police and could have been apprehended by other means; (3) probability of injury to the public considering the time, location, population, type of terrain, population of the area, posted speed limits, road conditions, duration of pursuit and length of pursuit; and (4) the officer's conduct during the pursuit, including whether he engaged lights and sirens, collided with any person, vehicle or object, kept his vehicle under control, followed department policies and rules, followed generally accepted customs, and speed. *Id.* 294-95, 520 S.E.2d at 117.

Applying these factors to the evidence in the summary judgment record, viewed in the light most favorable to Plaintiff, the Court finds that there are genuine disputes of material fact precluding summary judgment. The reason for the pursuit was Abney's traffic violations and refusal to heed law enforcement authorities' attempts to stop him. Abney was unkown

-30-

to Deputy Coe, although the evidence indicates that there was a tag on the motorcycle. The area in which the chase occurred was, for the most part, rural. To the extent that the chase occurred in areas of high traffic, the evidence shows that the suspect was not speeding. The evidence, viewed in the light most favorable to Plaintiff, nevertheless could be found to show that, in an attempt to stop Abney, Deputy Coe intentionally struck the rear of Abney's motorcycle with his patrol vehicle. If the jury should find that Deputy Coe took such intentional action, it could reasonably find that he was grossly negligent under North Carolina law and was not protected by immunity in either his individual or official capacity. Accordingly, the Court finds summary judgment inappropriate on Plaintiff's claim of gross negligence.

## Conclusion

For the reasons set forth above, **IT IS RECOMMENDED** that Deputy Coe's motion for summary judgment (Pleading No. 40) be denied in part and granted in part. Specifically, summary judgment should be denied to Deputy Coe in his individual capacity on the federal claims, Counts I, II, and III of the First Amended Complaint, and denied to Deputy Coe in his individual and official capacities on state law claims Counts VII and IX. Summary judgment should be granted to Deputy Coe in his official capacity on the federal claims, Counts I, II, and III, and granted to Deputy Coe in all capacities on Count VIII. In sum as to Deputy Coe, the case should proceed to trial on federal Counts I, II, and III (individual capacity) and state law Counts VII and IX (individual and official capacities).

**IT IS FURTHER RECOMMENDED** that Sheriff Hurley's motion for summary judgment (Pleading No. 37) be granted in all respects as to all claims made against him in his individual or official capacities. No cause of action against Sheriff Hurley should survive for trial.

**IT IS FURTHER RECOMMENDED** that Western Surety Company's motion for summary judgment (Pleading No. 37) should be denied in part and granted in part. Summary judgment should be denied to Western on Counts VII and IX of the First Amended Complaint, and granted on Count VIII. As to Western, the case should proceed to trial on state law Counts VII and IX based upon the alleged tortious conduct of Deputy Coe.

/s/ P. Trevor Sharp
United States Magistrate Judge

Date: December 15, 2005